MUNCIE GEAR WORKS, INC. ET AL. *v.* OUTBOARD, MARINE & MANUFACTURING CO. ET AL

No. 323.   Argued February 12, 1942.—Decided March 30, 1942.

*Mr. Samuel E. Darby, Jr.,* with whom *Messrs. Charles W. Rummler* and *Floyd H. Crews* were on the brief, for petitioners.

*Mr. Henry M. Huxley,* with whom *Messrs. George L. Wilkinson, S. L. Wheeler,* and *Isadore Levin* were on the brief, for respondents.

MR. JUSTICE JACKSON delivered the opinion of the Court.

We are required in this case to determine the validity of claims numbered 11, 12, 13 and 14 of letters patent No.

1,716,962, granted on June 11, 1929, to Harry L. Johnson for invention in a "water propulsion device." Respondent Johnson Brothers Engineering Corporation is the owner of the patent, and respondent Outboard, Marine & Manufacturing Company, is the exclusive licensee thereunder. Petitioner Muncie Gear Works, Inc., manufactured outboard motors which are claimed to infringe, and petitioner Bruns & Collins, Inc., sold them.

Respondents contend that this is a validly issued patent covering an invention which solved the problems of "cavitation" by relatively large and fast outboard motors. "Cavitation" is the drawing of air by the propeller from above the surface of the water to the propeller itself. Air so drawn reduces the propulsive effect of the propeller and causes "racing" of the motor with consequent risk of its disintegration and danger to the user. Increased speed or power entails a greater tendency to cavitate. Cavitation may be diminished by setting the propeller deeper in the water, but this increased projection increases resistance and retards speed.

Long before the patent in question, it was known that cavitation could be controlled, and in practice it was controlled, in at least all but relatively large and fast outboard motors, by setting a flat plate horizontally above the propeller and beneath the surface of the water, to act as a baffle and prevent the propeller from drawing air.[1] Respondents presented expert testimony to the effect that relatively large and fast water-cooled outboard motors cannot be successful unless they embody the asserted invention which respondents say is the subject matter of the claims in question. In general, this may be said to consist in the use of an anti-cavitation plate on a housing for the engine and propeller shafts enclosing the water passages for the cooling system, shaped both above and

---

[1] Smith, No. 1,226,400 (1917); Johnson, No. 1,467,641 (1923).

below the plate so as to reduce water displacement and resistance, and thus to reduce or eliminate eddy currents forming vortexes through which air can be sucked into the propeller. This permits adequate control of cavitation by means of a not unduly large anti-cavitation plate.

Harry L. Johnson, an experienced engineer and manufacturer of outboard motors, filed his application for the patent on August 25, 1926, but in no way suggested the combination now asserted as his invention. The single sheet of drawing accompanying the application was not changed during the prosecution of the application, and is the same as the drawing of the issued patent. This drawing showed an outboard motor assembly comprising, among other things, an engine at the top connected with a propeller at the bottom, with an anti-cavitation plate located horizontally above the propeller, approximately midway between top and bottom of the housing for the engine and propeller shafts. All water passages for the cooling system beneath the normal water level were shown to be enclosed in the housing. No cross section of this housing was drawn or indicated, and for all that appears from the drawing it might have been circular, triangular or rectangular. The drawing showed an arched member extending from the housing and anti-cavitation plate over the top and to the rear of the propeller, containing openings and passages for the intake and discharge of water, and ending in a curved "deflection plate" extending rearwardly like a fixed rudder. From the specifications and claims, it appeared that the purpose of the deflection plate was to compensate for the side and pivotal force of the moving propeller, which tended to draw the boat off its course unless the operator made constant adjustment to offset the "side throw." The specifications and drawings both indicated an anti-cavitation plate which the specifications said "prevents cavitation," but it was in no way asserted that the cavitation plate was new, or that it

was being employed in any novel coöperative relation to the other elements.

All of the claims of the application as originally made were rejected on December 15, 1926. On December 13, 1927, Johnson offered amendments which retained and amended the prior claims and added others directed to the feature of the deflection plate. In urging allowance, he said, among other things, "It is conceded that cavitation plates are old in the art as shown in the patent to Johnson cited," and he proceeded to urge as an invention the combination of the cavitation plate and the arching member or deflection plate. A similar supplemental amendment was filed on January 19, 1928. Several of the original claims as amended were allowed, and the rest of the claims rejected, on June 7, 1928.

On December 8, 1928, Johnson came forward with new claims. Claims 20 to 25 offered by this amendment made no mention of the deflection plate or of the arching members, but did not even suggest the presently asserted invention. On March 30, 1929, Johnson cancelled these claims and offered further amendments to his original application, together with a supplemental oath that he had invented the subject matter of the application as so amended, prior to the filing of the original amendment.[2] The effect of those changes was aptly described by the patent examiner: "The amendments have been such that the claims now emphasize the anti-cavitation plate rather than the anti-torque plate." With changes which are immaterial here, the new claims so offered became the claims in issue. In them, Johnson, for the first time, made claims relating to the exterior surface of the housing. Claim 12 described the housing as having "unbroken outer wall surfaces at each side," and claim 14, as having

---

[2] No question has ever been raised in this case respecting the veracity of this oath. Cf. *Elizabeth* v. *Pavement Co.*, 97 U. S. 126, 130.

"smooth and unbroken walls." Claims 11 and 13 were silent on the subject. The amendment also set forth an addition to the description which was incorporated in the description of the patent as issued. Here we find the expression "relatively smooth and substantially stream-line surfaces." Other than these, no indication of the nature of the surface or cross section of the housing was given at any time during the prosecution of the application.

The petitioners interposed defenses to all of the eight patents upon which respondents sued them in the District Court for the Northern District of Illinois, Eastern Division,[3] which we take to have put in issue the question whether the claims were void because made more than two years after the first public use of the device.[4]

---

[3] The patent here involved and two others were litigated in one suit, with which was consolidated another suit involving five other patents. One of the patents was withdrawn prior to trial, and the courts below disposed of six of the seven remaining patents adversely to the respondents.

[4] These read as follows:

"The defendants are informed and believe and therefore aver that each of the Letters Patent in suit was and is void and of no effect in law in that the alleged inventions or improvements described therein were invented by, or known to, or used by others in the United States, before the alleged inventions of the said patentees of the patents in suit, and for more than two years prior to the respective applications for said patents; among which prior inventors and users and those having prior knowledge are the patentees and their assigns of the several Letters Patents named in the annexed schedule 'A', at the places and addresses named in said Letters Patent, and other prior inventors, users and those having prior knowledge the names of whom, and the times and places of such other public uses, being at the present time unknown to defendants, but which, when fully ascertained, defendants pray leave to insert in this Answer by amendments thereto. [No such amendment was ever made or attempted.]

"Defendants are informed and believe and therefore aver that each of the Letters Patent in suit is invalid and void for the reason that the alleged invention thereof purported to be patented thereby are not

At the trial, two of the officers of respondent Outboard, Marine & Manufacturing Company testified on direct examination as respondents' witnesses to the effect that in January or February of 1926 one of this respondent's predecessors put on the market licensed outboard motors equipped with smooth-walled housings, anti-cavitation plates, and internal water passages as described in the claims in suit; and that at least one competitor (which was also a predecessor) had brought out a substantially similar, but unlicensed, motor about a year later.[5]

---

the same as were disclosed in the application therefor as originally filed, but are substantially different from any invention indicated, described, or suggested in the original applications therefor; that the applications therefor were amended in the specification and claims during the prosecution thereof and the alleged patented subject matter is not supported by oath as required by law; that the said applications were unlawfully enlarged during the prosecution thereof; and that the claims of said Letters Patent are invalid and void for the reason that they include matter not shown or adequately described in the said patents."

[5] Tanner, Vice President in charge of the sales of the Johnson Motors Division, testified as follows:

"Q. Are you familiar with the type of lower unit construction which is shown on this chart reproduced from the drawings of the Johnson patent No. 1,716,962? A. I am.

"Q. Do you recall when such a construction was introduced to the market, and by whom? A. To the best of my recollection it was for the model year of 1926, which would mean it was probably introduced about January or February of 1926.

"Q. By whom? A. By Johnson Motor Company.

"Q. At that time was Evinrude Motor Company a competitor of Johnson Motor Company? A. Yes, they were.

"Q. At that time was Elto Motor Company a competitor of Johnson Motor Company? A. Yes.

"Q. At that time was Lockwood-Ash Motor Company a competitor of Johnson Motor Company? A. Yes.

"Q. What was the result of the introduction of this model by Johnson Motor Company in 1926? A. As far as I was concerned, I was connected with the Lockwood-Ash Motor Company that was making a

In an unreported decision the District Court did not touch on this question, but found as a matter of fact and of law that the claims in question were invalid because merely aggregational. On appeal to the Circuit Court of Appeals the issue of sale or public use was not clearly presented,[6] if indeed it was presented at all; and the opinion rendered by that court did not advert to it, although it held that the claims here involved were valid and infringed. 119 F. 2d 404. While there was no conflict

motor in 1926 and not having that combination; and, not having it, we did not have the satisfactory performance that the Johnson combination had.

"Q. In what respect did your motor not have as satisfactory a performance? A. It had cavitation.

"Q. What did your motor lack particularly of the structure shown in this Johnson patent? A. We did not have an anti-cavitation plate.

"Q. What did you do to remedy this difficulty? A. In the fall of 1926, for the 1927 model year, we put on an anti-cavitation plate.

"Q. Did that remedy your difficulty, so far as cavitation was concerned? A. Yes.

"Q. Do you know what was done by Evinrude and Elto? A. My recollection is that possibly, not at the same moment, I doubt Evinrude did the same year, put on an anti-cavitation plate on the stream line housing. I don't remember clearly whether Elto did it that year or the next, but they subsequently did put on the same combination."

Irgens, Chief Engineer and Production Manager of the Evinrude Division, testified as follows:

"Q. How long has it been true that all of the larger sizes of outboard motors have been equipped with smooth walled lower unit housings, anti-cavitation plates intermediate the top and bottom thereof, and internal water passages? A. They became popular about 1926, and from then on practically all of them have been made that way."

[6] The brief of petitioners in the Circuit Court of Appeals, which has been certified to this Court by the Clerk of that court, contained the following statement under the heading of anticipation: "In considering these claims it is appropriate to first have in mind their historical background, in view of the importance that Plaintiffs place upon them as being for subject matter that 'solved a problem' pre-

of decision with respect to these claims,[7] we granted certiorari in view of the questions presented and because the patent dominates a substantial portion of an industry so concentrated in the Seventh Circuit that litigation in other circuits, resulting in a conflict of decisions, is unlikely. 314 U. S. 594. *Schriber-Schroth Co.* v. *Cleveland Trust Co.*, 305 U. S. 47.

Section 4886 of the Revised Statutes, as amended and applicable to the present case, provided for the issuance of a patent to an inventor upon certain conditions, one of which was that his invention was "not in public use or on sale in this country for more than two years prior to his application." [8]

In an effort to avoid the effect of this provision, respondents contend that the question of its applicability was not raised either in the District Court or in the Circuit Court of Appeals; that there was no opportunity to meet the issue; and that the invention as finally claimed was disclosed by the application as originally made or in any event as amended on December 8, 1928.

However, the evidence of public use and sale, given, as we have pointed out, by respondents' own officers and witnesses,[9] has not been questioned or contradicted, and

---

viously 'stalling' a great industry. In the first place the subject matter of these claims was in no way considered in or made a part of the original application . . . It was not until more than two years later that the patentee on December 6, 1928, by his amendment 'C', added claims to his application covering any of the matter that is now deemed to be of such great importance. Then, for the first time the patentee claimed, in claims originally numbered 17 to 25, inclusive, the anticavitation plate apart from the limitations which characterized his originally filed disclosures and originally filed claims."

[7] They had previously been sustained by a District Court in the Sixth Circuit. *Johnson Brothers Engineering Corp.* v. *Caille Bros. Co.*, 8 F. Supp. 198. Caille is no longer in the business.

[8] The period is now one year. Act of August 5, 1939, 53 Stat. 1212, 35 U. S. C. § 31.

[9] See footnote 5, *supra.*

is interpreted by respondents' counsel in accordance with our view of it. In their brief they say "It is true that after Johnson Motor Company, licensee under the patent in suit, had popularized devices embodying the subject matter of the claims in suit, at least one competitor copied the combinations of the claims in suit from the Johnson motor before claims closely resembling those in suit were presented to the Patent Office in December 1928. This was done by Lockwood Ash Motor Company, then a competitor, but subsequently merged to constitute a predecessor of Respondent, Outboard, Marine & Manufacturing Company. . . . Lockwood Ash first adopted this combination for the 1927 season. The model year commenced in January or February. . . . Concededly, the original claims were limited additionally either to the deflection plate or to the arched support. But claims without these limitations had, contrary to Petitioners' assertions, been filed December 8, 1928. The difference in date is critical because the record shows that the only manufacture of devices embodying the invention which had occurred more than two years prior to December 8, 1928, was licensed manufacture by Johnson Motor Company, predecessor of Respondent Outboard, Marine & Manufacturing Company, and in 1926, exclusive licensee of Respondent Johnson Brothers Engineering Corporation, owner of the application for the patent in suit. . . . The only concern which produced outboard motors in accordance with the invention of the patent in 1926 was the exclusive licensee under the application for the patent in suit. . . . March, 1929, would be more than two years after the opening of the 1927 model year; but the actual date in December, 1928, when the patentee claimed the specific invention in controversy, without regard to deflection plate or arched support, was well within two years of the first competitive use of the invention, even assuming that the

two year period is of any significance in the present case. . . ."

It is clear to us, however, that the amendments of December 8, 1928, like the original application, wholly failed to disclose the invention now asserted.

The claims in question are invalid if there was public use, or sale, of the device which they are claimed to cover, more than two years before the first disclosure thereof to the Patent Office. Cf. *Railway Co.* v. *Sayles,* 97 U. S. 554, 557, 559, 563–64; *Schriber-Schroth Co.* v. *Cleveland Trust Co., supra,* at 57. Section 4886 of the Revised Statutes would in terms provide for their invalidity had they been offered by application rather than by amendment; and whatever may be the efficacy of an amendment as a substitute for an application, it surely can effect no more than the application itself.

We think the conclusion is inescapable that there was public use, or sale, of devices embodying the asserted invention, more than two years before it was first presented to the Patent Office. We are not foreclosed from a decision under § 4886 on the point by the obscurity of its presentation in the courts below. This issue has been fully presented to this Court by the petition for a writ of certiorari, and in subsequent briefs and argument; and there is not the slightest indication that respondents have been prejudiced by such obscurity. To sustain the claims in question upon the established and admitted facts would require a plain disregard of the public interest sought to be safeguarded by the patent statutes, and so frequently present but so seldom adequately represented in patent litigation.

We therefore hold that the claims in question are invalid under § 4886 of the Revised Statutes, and accordingly have no occasion to decide any other question in the case.

*Reversed.*