WESTERN LITHOGRAPH CO. et al. v. W. H. BRADY CO.

Civil Action No. 2804.

District Court, E. D. Wisconsin.

April 10, 1947.

384

Ira M. Jones, of Milwaukee, and Collins Mason (of Mason & Graham), of Los Angeles, Cal., for plaintiffs.

Louis Quarles and David A. Fox, both of Milwaukee, Wis., for defendant.

DUFFY, District Judge.

This is a suit for infringement of patent and for unfair competition. U.S. Patent No. 2,372,944 was issued to plaintiff Welch on April 3, 1945, on application filed April 7, 1942. Welch still is the owner of the patent. Since July, 1942, plaintiff Western Lithograph Company has been and now is the exclusive licensee, and sells wire marking devices under the trade-name "E-Z Code Markers." All three of the claims of the patent in suit are in issue. Claim 1 reads:

"A wire marking unit for use in distinguishing wires and circuits in electrical wiring, comprising a backing member, a relatively limp and pliable material releasably held on said backing member by a non-hardening adhesive, said backing member being of sufficient hardness and relative stiffness to constitute a working base on which to perform cutting of said material while held thereon, and cuts in said material arranged to provide a plurality of indicia strips in side by side parallel arrangement on said backing member, each of said strips being of a length adequate to wrap around a wire and to accommodate repetitions of indicia disposed lengthwise thereof to aid in reading the indicia when said strips are applied to wires to be identified thereby, any one of said strips being independently and selectively peelable from the backing member without preparatory treatment and being in a condition upon removal from the backing member for immediate and direct adhesion to a wire to be distinguished thereby."

Claim 2 differs from Claim 1 only in specifying that a coating be applied to protect the indicia bearing surfaces of the strips. Claim 3 substitutes "articles" for "wires" and contains the provision that the edges of the adjacent separate label strips are abutting.

As the electrical industry developed it became more and more common for electric wires to be placed in conduits and other places inaccessible to view, and the suitable marking of such wires for purposes of identification was a problem. Various devices were commonly used, such as paper tags tied to the wires by string or wire, metal tags or clamps applied around the wires by special tools, sleeves applied axially over the wires, notching or nicking of the wires, and colored coverings. Most of these had recognized disadvantages. The patent in suit provided for indicia repeated along the length of a label, so that when it was wrapped around a wire there would be several identifying numerals separate and apart, and thus more easily read from any angle.

Although Welch's application had been filed April 7, 1942, all his claims had been rejected by the Patent Office at the time the defendant entered the field in the summer of 1944. On February 5, 1945, Welch proposed certain amendments and the file wrapper indicates that one of the principal reasons why the claims of the patent in suit were allowed was that the proviso, "each of said strips being of a length adequate to wrap around a wire," was included in each of Claims 1 and 2, and the proviso, "said strips being of a length adequate to wrap around the articles," was included in claim 3. The three claims presented by the amendment filed February 5, 1945, became the three claims of the patent as issued.

When the application was filed originally nothing in the drawings or in the specifications or in any claim stated that

the labels were to have "a length adequate to wrap around a wire" (or article). It is entirely possible and quite probable that the applicant then had in mind that the length of the labels be adequate to extend around a wire and in addition have a part of it with the indicia thereon sticking out like a flag on one side of the wire. In the original disclosure of the Welch patent, it was stated, "The labels may also be made of any desired length and breadth." This would seem to be inconsistent with the new material contained in the amendment. It is significant that every claim which had theretofore been presented without the limitation in question had been rejected on the prior art.

Plaintiff Western Lithograph Company had sold substantial quantities of labels starting in early 1942, and more than three years before the above-described amendment was presented to the Patent Office. Under the circumstances, public use for more than one year makes the claims invalid. Muncie Gear Works, Inc., v. Outboard, Marine & Manufacturing Co., 315 U.S. 759, 768, 62 S.Ct. 865, 86 L.Ed. 1171.

 However, I conclude that the patent in suit is invalid for additional reasons.

There are two methods of dispensing adhesive tape: (1) By mounting on a flat backing upon which it is releasably held; and (2) the familiar roll form. The former method had been proposed at least 25 years before Welch came upon the scene (Lang Patent No. 1,081,392), and the latter is exemplified by Scotch number tape which is wire-marking adhesive tape with numbers thereon. Welch acknowledged in his patent application the existence of Scotch number tape for coding wires. It is apparent that a wire marked with this type of tape has every advantage and is structurally identical with a wire marked with the plaintiff's label. Wrapped side by side on the same wire, their appearance is almost identical.

Welch described sheet material coated on one side with non-drying adhesive. This is known as pressure sensitive tape, or more commonly as adhesive tape. The non-drying adhesive surface of adhesive tape or

pressure sensitive tape must be protected from exposure until such time as it is placed in use. In the Scotch number tape it is put up in a roll and this gives the necessary protection.

I conclude that Welch was anticipated by Avery. By the end of 1941, Avery's label business had grown to large proportions and he had sold over one billion labels. His business was conducted in the same city where Welch lived. In the spring of 1941, Avery received from Payne Furnace Company a regular commercial order for, and made and sold, a quantity of printed adhesive tape labels mounted in parallel on a backing sheet, and carrying typical wire marking indicia repeated lengthwise on the label. The idea of marking wires by adhesive tape labels dispensed from a flat backing sheet was given considerable publicity by Avery by means of catalogues and trade paper advertising. The application for the patent in suit was filed more than one year after the commercial public use and sale by Avery of printed wire marking adhesive tape labels mounted on a flat backing.

Plaintiffs seek to brush aside the Avery sale to Payne Furnace Company on the ground that in spite of extensive advertising it was the only sale made and was not a commercial success. Plaintiff also refers to it as "an abandoned experiment." However, R.S. § 4886, 35 U.S.C.A. § 31, provides that an essential to patentability is that the thing sought to be patented shall not be "in public use or on sale in this country for more than one year prior to his application." It has been held that a single instance of sale is a bar to patentability. Consolidated Fruit-Jar Co. v. Wright, 94 U.S. 92, 94, 24 L.Ed. 68; Smith & Griggs Manufacturing Co. v. Sprague, 123 U.S. 249, 257, 8 S.Ct. 122, 31 L.Ed. 141. See also: Tampax, Inc., v. Personal Products Corp., D.C., 38 F.Supp. 663, 672, affirmed 2 Cir., 123 F.2d 722. Therefore, the flat mounted adhesive tape wire marking labels made and sold by Avery in March, 1941, are a complete anticipation.

It was old in the art to furnish adhesive tape in flat form mounted on a protected backing and cut into small pieces as labels

as disclosed in Avery Patents Nos. 2,220,-071 and 2,304,787. It was also prior to proven knowledge by Welch that adhesive tape furnished in flat form could be mounted upon a backing sheet hard and stiff enough in relation to the adhesive tape so as to furnish a suitable cutting base upon which the adhesive tape could be cut into small pieces to be used as labels, and the labels cut apart while mounted as disclosed in Avery Patent No. 2,304,787. This latter patent also disclosed the cutting of adhesive tape labels mounted on a flat backing so that adhesive labels would have abutting edges.

■ Plaintiffs argue that the claims of the patent in suit are not anticipated by the Avery patents or by Lang Patent No. 1,081,-392, because each claim of the patent in suit requires that the sheet from which the indicia strips are formed shall be relatively limp and pliable in comparision with the backing member and also requires the backing member be hard and relatively stiff in comparison with the backing sheet. However, if Welch had intended to restrict the claims so that the backing sheet would have to be stiff in relation to the tape for purposes in addition to cutting the strips, it was up to him to so state in the claims. McCarty v. Lehigh Valley Railroad Co., 160 U.S. 110, 116, 16 S.Ct. 240, 40 L.Ed. 358. This he did not do.

Plaintiffs argue that Welch teaches that the transverse parallel cuts penetrate the backing member and that the strips are thus selectively peelable. But there is not the slightest indication in the claims or otherwise that the presence or absence of indentations in the backing, resulting from the action of the cutting tool, is a determining characteristic of the thing sought to be covered. As long as the backing member is hard and stiff enough in relation to the adhesive tape to cause the cutting tool to cut the tape, it will have a sufficient hardness and stiffness in relation to the tape to constitute a working base for such cutting. Even the glassine material used by Avery holds the tape while the cutting is successfully performed and meets every requirement of this part of the claims.

■ Plaintiffs experienced considerable commercial success with their product and strongly urge that such success points to novelty and invention. But commercial success does not obliterate Avery's commercial use of flat mounted wire-marking adhesive tape labels hereinbefore discussed. Nor can such success generate invention where invention does not exist. John T. Riddle, Inc., v. Athletic Shoe Co., 7 Cir., 75 F.2d 93.

Defendant contends that in any event the patent in suit is unenforceable by reason of the conduct of Western Lithograph Company in marking certain pipe coded cards with the number of the patent in suit. This practice started in April, 1945. It was called to the attention of plaintiffs in April, 1946, when defendant served an interrogatory asking how long the practice had been going on. Some evidence indicated the practice continued until at least 1946. Defendant argues that the rule announced in Mercoid Corp., v. Mid-Continent Investment Co., 320 U.S. 661, 64 S.Ct. 268, 88 L. Ed. 376, applies, and that the patent is thus unenforceable. In view of my determination hereinbefore stated that the patent is invalid, it is not necessary to pass on this question. Although plaintiffs claim that the printing on the cards of the number of the patent in suit was due to a shop error, the least that may be said was that plaintiff Western Lithograph Company was guilty of extreme laxity.

## Unfair Competition.

■ Plaintiffs do have some reason to complain about defendant on the basis of unfair competition. Defendant saw some of plaintiffs' products at the Cutler-Hammer plant at Milwaukee in 1944. It was claimed that these markers were defective and in its endeavor to improve the product, the defendant copied a number of the features of plaintiffs' product. It adopted the same size and shape of the backer card. It applied the trade-name of "Quik-Labels," and printed its own name on a space at the end of the card similar to the manner in which plaintiff Western Lithograph Company's trade-name and company name appeared. Defendant used, at least in part, plaintiff Western Lithograph Company's catalogu-

ing and stock numbering system. It used some of plaintiff Western Lithograph Company's advertising slogans, and varied others only slightly, for example:

When the defendant received orders for merchandise under the plaintiffs' trade-name, it did not attempt to fill any such orders but provided the party with the cor-

| Plaintiffs | | Defendant | |
|---|---|---|---|
| Simple as A B C | A (Illustration) (Peel off strip | Simple as 1, 2, 3 | 1 (Illustration) (Peel off label |
| | B (Illustration) (Wrap around wire | | (Illustration) 2 (Wrap it around (the wire |
| | C (Illustration) (Each wire coded | | (Illustration) 3 (Every wire iden- (tified |

The evidence also showed actual confusion on the part of purchasers.

Nevertheless, in spite of defendant's unethical practices, the conduct of plaintiff Western Lithograph Company was such that a court of equity should not grant it relief. Part of the confusion was also due to plaintiff Western Lithograph Company's actions. Of the several hundred stock numbers which plaintiff Western Lithograph Company was using in the spring of 1945, over two-thirds of them had first appeared on defendant's stock list published in December, 1944. Plaintiff even copied several mistakes which the defendant had made. Further, in the spring of 1945, plaintiffs displayed a caption reading, "Speed Legibility Durability Flexibility Uniformity," and one would be naive not to conclude that it was inspired by defendant's caption used in the fall of 1944, "Speed Uniformity Flexibility Visibility Good Looks." In November, 1944, defendant adopted as a backing material for its label cards the substance of white vulcanized fibre at a time when plaintiff Western Lithograph Company was employing for its label cards a color film which is a cardboard material with a smooth, shiny, transparent film cemented to a face thereof. However, Western Lithograph Company later mounted its label cards upon the same kind of white fibre material which defendant had adopted. In January, 1945, defendant introduced a feature by rendering the backing material easily divisible which it called its "self-starter" and in January, 1946, the Western Lithograph Company followed with a somewhat similar device.

rect name and address of plaintiff Western Lithograph Company. On the other hand when plaintiff Western Lithograph Company received orders for merchandise described by the trade-name "Quik-Labels" it filled such orders with its own product.

I conclude that plaintiff Western Lithograph Company did not come into court with clean hands, and therefore is not entitled to relief on the basis of unfair competition.

Defendant is entitled to judgment dismissing the action. Counsel for defendant may prepare findings of fact and conclusions of law in accordance with this opinion and submit same to counsel for plaintiffs prior to submission to the court.