**PROTECTIVE CLOSURES CO., Inc., et al.
v. CLOVER INDUSTRIES, Inc.**

Civ. 5432.

United States District Court
W. D. New York.

May 18, 1953.

Popp & Sommer, Buffalo, N. Y. (Kenneth R. Sommer, Buffalo, N. Y., of counsel), for plaintiffs.

John S. Powers, Buffalo, N. Y., for defendant.

KNIGHT, Chief Judge.

This is a suit for infringement of Patent No. 2,580,762, issued January 1, 1952 to plaintiffs Joseph R. Grenier and Ernest W. Dormeyer, Jr. as joint patentees. For convenience it will be called the "Grenier" patent.

The defendant has filed its answer containing a counterclaim for a declaratory judgment that the defendant has the right to manufacture and sell the closures which the plaintiffs charge to infringe and that the Grenier patent, in so far as it is charged to infringe, is void and invalid. Defendant now moves for a summary judgment pursuant to its counter-claim based on the pleadings, the deposition of plaintiff Grenier, certain exhibits and patents of the prior art. The issue is limited to Claim I of the patent, which is:

"1. As an article of manufacture, a closure comprising in its unmounted condition a single polyethylene body having a circular end wall of substantially uniform wall thickness, an enlarging frusto-conical side wall projecting axially from the margin of said end wall, said side wall being of substantially uniform thickness of from .025 to .040 inch for at least the greater part of its distance from said end wall and the angularity of said side wall relative to the axis thereof being from 2.5° to 7.5° and the axial length of said side wall being such that the internal diameter at the rim thereof is from $\frac{1}{16}$ to $\frac{3}{16}$ inch greater than the internal diameter thereof across said end wall and forming inner and outer parallel frusto-conical working faces adapted to engage securely, respectively, with male and female generally cylindrical parts, an annular flange of substantially the same wall thickness as said side wall projecting radially outwardly from the rim of said side wall and an integral annular bead projecting radially inwardly from said side wall closely adjacent the rim thereof."

The devices in question have been described as "protective closures". The Grenier application and patent describes the use of these closures "as dust and moisture seals and shipping protectors for threads, pipe and tubing ends and the like. * * * in masking parts for paint spraying and.

electroplating * * * on and in tubing, fittings, valves, automotive, aircraft and hydraulic parts." This protective closure is of cup-like form, with a flat base and a frusto-conical wall. It is made of polyethylene material, and is formed in a mold into which the material is introduced, by compression or injection, as a heated fluent paste. Both parties herein manufacture and sell a "protective closure" utilized for like purposes. Grenier describes the device as usable as a cap or plug. It is flexible.

The Grenier patent has an internal projection designated as "an annular internal integral bead" and it is described as having "two important advantages. It insures an adequate seal with the largest size of cylindrical projection which the cap is designed to accommodate * * *. More important, this integral internal bead in the mouth of the closure, together with the abrupt shoulder 10 opposing the end wall 5, greatly facilitates the molding of the closure from polyethylene."

The plaintiff's application for patent as originally filed April 28, 1950, contained eight claims. Defendant contends that these eight claims constitute two groups: the first group contained no reference to the bead (Item 4); the second group in each called for the bead in specific terms (5 to 8). In claims 5 and 6 (claim 6, as amended, being claim 2 of the patent) the bead is described as "being wedge-shaped in cross section and arranged to provide an abrupt annular shoulder opposing said end wall". In claims 7 and 8 (claim 8, as amended, being claim 3 of the patent) the bead is described in the same terms with the further qualification relating to the size "from .007 to 0.10 inch."

On February 20, 1951, the examiner rejected all eight claims. On April 13, 1951, the examiner reconsidered the claims and rejected all claims except 6 and 8 which (as claims 2 and 3 in the patent) were allowed. On July 9, 1951, all the claims 1, 2, 3, 4, 5 and 7 were again rejected. On September 10, 1951, claims 1, 2, 3, 5 and 7 were cancelled and claim 4 was retained. On October 4, 1951, claim 4 was rejected.

No additional claims were presented from April 28, 1950 to October 4, 1951, and claims 6 and 8 were the only ones allowed in that period. The bead was not included as an element in claim 4. No appeal was taken, but on October 17, 1951 claim 1 of the patent was restated and included the description of the bead, which the defendant claims was in terms broader than the description in the application and claims 4 and 8. The new claim 1, as rewritten, reads: "an internal angular bead projecting radially inwardly from said side wall closely adjacent to the rim thereof". No reference is made in that restatement to the cross sectional form or its dimensions. The application was thereafter allowed.

The defendant claims that Claim 1 of the patent is for a new patent and that the closures were manufactured and sold more than one year before the application was presented and disclosed to the patent office.

The plaintiffs claim that the invention was first disclosed as of the time when the context of the application as a whole first reveals what applicants are teaching as their invention. In conflict with this position the defendants take the position that the invention is first disclosed as of a time when the claim, as finally worded in the patent, first appears in the application. The defendant relies upon Muncie Gear Works v. Outboard Marine & Mfg. Co., 315 U.S. 759, 62 S.Ct. 865, 86 L.Ed. 1171.

Was the subject matter of the later claims disclosed to the Patent Office by the drawings, description and specifications of the application filed April 28, 1950? There seems to be little question that defendant infringed if Claim 1 is a valid claim. The patent is described as important and that this bead is a feature element. It is referred to invariably in specific terms of structure and dimensional limitation and as distinguishing it from beads of other form. In Column 3, lines 22–31 of the application with reference to the bead it is also stated: "This internal bead is wedge shaped in cross section and is arranged to provide an abrupt angular shoulder 10 opposing the end wall 5. The height or axial extent of this integral bead 9 is from $\frac{1}{8}$ to $\frac{3}{16}$ inch

and the abrupt shoulder 10 projects radially inwardly from the wall 6 from .007 to 0.10 inch."

For convenience it may be expedient and useful to quote excerpts from the application for the patent filed April 28, 1950:

"A further important feature of the invention resides in the provision of an annular internal integral bead 9 at the rim of the wall 6. This internal bead is wedge-shaped in cross section and is arranged to provide an abrupt annular shoulder 10 opposing the end wall 5. The height or axial extent of this integral bead 9 is from 1/8 to 3/16 inch and the abrupt shoulder 10 projects radially inwardly from the wall 6 from .007 to 0.10 inch.

"This integral internal bead 9 within the mouth of the closure has two important advantages. It insures an adequate seal with the largest size of cylindrical projection which the cap is designed to accommodate, the abrupt annular shoulder 10 forming a hook which insures firm engagement with such a cylindrical projection. More important, this integral internal bead in the mouth of the closure, together with the abrupt shoulder 10 opposing the end wall 5, greatly facilitates the molding of the closure from polyethylene. * *

"Without the provision of the internal integral bead 9 with its annular abrupt shoulder 10, great difficulty was experienced in getting the closure out of the cavity of the die 13. * * *

"By the provision of the internal beads 9 at the mouths of the closures and with their abrupt annular shoulders 10 facing the end walls 5, the removal of the product from the dies is greatly facilitated. * * * the abrupt shoulder 10 formed on each closure providing a positive interlock with the male die for this purpose, this interlock having sufficient strength to break the vacuum tending to form between the closure and the cavity of the die 13. After the male die 15, together with the closure thereon, has been so withdrawn, it is very simple to peel the closure from the male die, the internal bead 9 being readily released from the male die. * * *

"The barb or wedge shaped integral internal bead 9 with its abrupt shoulder 10 opposing the end wall 5 is also highly important, particularly in the injection molding of the closure, it likewise being important that this bead 9 be within the dimensions indicated, namely, an axial extent of from 1/8 to 3/16 inch and the shoulder 10 having a radial projection of from .007 to 0.10 inch."

And the claims stated in the application contain the following:

"5. * * * and an integral annular bead projecting radially inwardly from the rim of said side wall, said bead being wedge-shaped in cross section and arranged to provide an abrupt shoulder opposing said end wall. * * *

"8. A closure comprising a polyethylene body having * * * an annular flange projecting radially outwardly from the rim of said side wall, and an integral annular bead projecting radially inwardly from the rim of said side wall, said bead being wedge-shaped in cross section and arranged to provide an abrupt annular shoulder opposing said end wall, said shoulder extending axially from the extremity of the rim of said side wall from 1/8 to 3/16 inch and said abrupt shoulder projecting radially inwardly from said side wall from .007 to 0.10 inch."

The patent, granted January 1, 1952, was pursuant to original application of the individual plaintiffs No. 158,898, filed April 28, 1950, which contained the same drawings, without change, and among other things, the following language which was also contained in the original application:

"A further important feature of the invention resides in the provision of an annular internal integral bead 9 at the rim of the wall 6. This integral bead is wedge-shaped in cross section and is arranged to provide an abrupt annular shoulder 10 opposing the end wall 5. The height or axial extent of this integral bead is from 1/8 to 3/16

inch and the abrupt shoulder 10 projects radially inwardly from the wall 6 from .007 to 0.10 inch.

"This integral bead 9 within the mouth of the closure has two important advantages. It insures an adequate seal with the largest size of cylindrical projection which the cap is designed to accommodate, the abrupt annular shoulder 10 forming a hook which insures firm engagement with such a cylindrical projection. More important, this integral internal bead in the mouth of the closure, together with the abrupt shoulder 10 opposing the end wall 5, greatly facilitates the molding of the closure from polyethylene. * * *

"Without the provision of the internal integral bead 9 with its annular abrupt shoulder 10, great difficulty was experienced in getting the closure out of the cavity of the die 13. * * *

"By the provision of the internal beads 9 at the mouths of the closures and with their abrupt shoulders 10 facing the end walls 5, the removal of the product from the dies is greatly facilitated. * * *."

And in the claims which are a part of the patent there are recited in part as follows:

"1. * * * an annular flange of substantially the same wall thickness as said side wall projecting radially outwardly from the rim of said side wall and an integral annular bead projecting radially inwardly from said side wall closely adjacent the rim thereof.

"2. * * * an annular flange projecting radially outwardly from the rim of said side wall, and an integral annular bead projecting radially inwardly from the rim of said side wall, said bead being wedge-shaped in cross section and arranged to provide an abrupt annular shoulder opposing said end wall.

"3. * * * (Contains the exact wording as Claim '2' above and adds:) said shoulder extending axially toward said end wall from the extremity of the rim of said side wall from 1/8 to 3/16 inch

and said abrupt shoulder projecting radially inwardly from said side wall from .007 to 0.10 inch."

It will be noted that the language of the original application with its claims and the patent with its claims are too similar or identical to lend themselves to the criticism that the original application and the patent did not contemplate the use of the abrupt shoulder bead within the closure when placed, for instance, as a cap over the threads of pipes and with like protective effect from the annular flange projecting radially outwardly from the rim of the side wall when used as a plug in the female threads of pipes. In this respect there was no amendment of the application. The drawings have not been amended yet they definitely show the beads, and indicate their importance.

The opinion in Muncie Gear Co. v. Outboard Co., 315 U.S. 759, 768, 62 S.Ct. 865, 869, is not helpful. The court there said: "It is clear to us, however, that the amendments of December 8, 1928, like the original application, wholly failed to disclose the invention now asserted." See Myerson v. Dentists' Supply Co., D.C., 66 F.Supp. 31, 37 and cases there cited; Proctor & Gamble Manufacturing Co. v. Refining, Inc., 4 Cir., 135 F.2d 900; Harries v. Air King Products Co., 2 Cir., 183 F.2d 158; Michigan Carton Co. v. Sutherland Paper Co., 6 Cir., 29 F.2d 179, 184.

It does not appear that the individual plaintiffs abandoned their application prior to the issue of the patent. The claims of plaintiffs must be broadly construed. Binney & Smith Co. v. United Carbon Co., 4 Cir., 125 F.2d 255, reversed on other grounds. They were sufficiently apparent from the description in the application, the claims there made and the drawings attached thereto, all indicating clearly that the beads were a feature of the closure. The application of plaintiffs filed April 28, 1950, was the first disclosure to the Patent Office of plaintiffs' claims for their closure and was for the original issue of the patent. The notice of allowance shows "Serial No. 158,898—Filing date April 28, 1950—number claims allowed 3". It may be significant that the Patent Office maintained

346

the original filing date as unchanged indicating to the examiner that there had been no amendment or change in the application for a different patent. The combination in the closure of the beads and their size and location may be the crux of the validity of the patent issued to the individual plaintiffs. There seems to be no question here that defendant has infringed the patent but defendant raises the question of validity of the patent. The issuance of the patent is prima facie evidence of validity and the burden rests on one contesting to overcome such presumption by clear and satisfactory proof. Cantrell v. Wallick, 117 U.S. 689, 6 S.Ct. 970, 29 L.Ed. 1017; Radio Corp. of America v. Radio Engineering Laboratories, Inc., 293 U.S. 1, 54 S.Ct. 752, 78 L.Ed. 1453; Bianchi v. Barili, 9 Cir., 168 F.2d 793; F. E. Myers & Bros. Co. v. Gould Pumps, Inc., D.C., 91 F.Supp. 475, 479; 3 Walker on Patents (Deller's Ed.) 2009. The validity of the patent in suit, however, has public importance and the better practice, approved by the Supreme Court in Sinclair & Carroll Co., Inc., v. Interchemical Corp., 325 U.S. 327, 330, 65 S. Ct. 1143, 89 L.Ed. 1644, seems to be that the District Court should inquire fully into the validity of the patent. And see Paul E. Hawkinson Co. v. Dennis, 5 Cir., 166 F.2d 61, 63. Further, trial judges should exercise great care in granting motions for summary judgment. Doehler Metal Furniture Co. v. United States, 2 Cir., 149 F.2d 130, 135.

■ Both parties, by their respective pleadings, moving papers and briefs, contend that there are material issues surviving. Plaintiffs' motion for partial summary judgment, if granted, could be effective only in the event of trial. Upon the trial the relief now sought would be available and may then be given consideration. If a change in position in the meantime would avoid the present status of the parties it will be given attention when disclosed to the Court. Without prejudice to its renewal, plaintiffs motion for partial summary judgment should be denied.

For the reasons indicated herein the defendant's motion for summary judgment should be denied.

In view of the foregoing, other matters raised upon the motions are not now determined but may be presented and considered at the trial.

Defendant's motion for summary judgment is denied and plaintiffs' motion for partial summary judgment is denied.