The LAITRAM CORPORATION, Plaintiff,

v.

DEPOE BAY FISH COMPANY and Pacific Pearl Seafoods, Inc., Defendants.

Civ. No. 80–775–RE.

United States District Court, D. Oregon.

June 8, 1982.

Paul J. Hayes, Weingarten, Schurgin & Gagnebin, Boston, Mass., J. Pierre Kolisch, Kolisch, Hartwell & Dickinson, Portland, Or., for plaintiff.

Arthur L. Whinston, Klarquist, Sparkman, Campbell, Leigh, Whinston & Dellett, Portland, Or., Gordon L. MacPherson, Litchfield, MacPherson, Carstens & Gillis, Newport, Or., G. Eric Lonnquist, Portland, Or., for defendants.

REDDEN, District Judge:

This is a suit for patent infringement brought by the Laitram Corporation, holder of U.S. Patent No. 3,276,878 (hereafter the '878 patent). That patent covers a process for peeling shrimp mechanically after they are cooked. The defendants in this action are two seafood processors who, the plaintiff asserts, use the process in their operations and do not pay royalties. The defendants claim that the '878 patent is invalid and assert all defenses: obviousness, new matter, usefulness, wrong inventor, fraud on the patent office, patent misuse and non-infringement. The case was tried to the court on April 5th through 9th, 1982. I conclude that the patent is valid, and that it was infringed by both defendants.

## I. *Facts*

The '878 patent was granted on October 4, 1966 to James M. Lapeyre. Lapeyre is an inventor of several other pioneer advances in the field of seafood processing. The most pertinent of his prior inventions is U.S. Patent No. 2,429,828, which discloses a *machine* for peeling *raw* shrimp. The patent in suit, which covers a *process* for peeling *cooked* shrimp, is now owned by the Laitram Corporation, which is in turn controlled by the Lapeyre family of New Orleans, Louisiana.

The defendants in this case are two seafood processors on the West Coast. One, Depoe Bay Fish Company, is located in Newport, Oregon. The other, Pacific Pearl Seafoods, is located in Alaska and Washington State.

Laitram had for many years licensed its process to West Coast firms. The patent will expire in 1983. The license rate was $3.00 per thousand pounds of shrimp subjected to the process until recently, when Laitram doubled the rate. The doubling of the royalty rate precipitated strong objections throughout the West Coast industry and this litigation, challenging the validity of the patent, soon followed.

It is also worthy of note that this litigation is but the latest courtroom confrontation between James M. Lapeyre and one Ray Skrmetta.[1] These competitors are described as "arch-rivals" and their hard feelings are obvious. Although Skrmetta was no longer a third party plaintiff when this matter was litigated, he did serve as defendants' "tableman" and one of their expert witnesses. The record also reveals that Skrmetta financially assisted the remaining defendants.

Lapeyre owned a prior patent, for a machine to peel *raw* shrimp, which was designed for use on the larger, panaeid species of shrimp found in warm-water regions such as the Gulf Coast. That patent is now in the public domain. The patent in suit, for a process for peeling *cooked* shrimp, is designed for use on the smaller, pandalid species of shrimp which occupy cold-water regions such as Scandinavia and the Pacific Northwest.

## II. *Validity of the Patent: Presumption of Validity*

■ The patent in suit enjoys a presumption of validity, 35 U.S.C. § 282, and the party challenging its validity carries the burden of demonstrating invalidity by "clear and convincing evidence." *Saf-Guard Prods., Inc. v. Service Parts, Inc.*, 532 F.2d 1266, 1271 (9th Cir. 1976), *cert. denied*, 429 U.S. 896, 97 S.Ct. 258, 50 L.Ed.2d 179 (1976). However, that presumption disappears when challenged on the grounds of "obviousness," pursuant to 35 U.S.C. § 103, if it appears that the holder of the patent had failed to disclose to the patent office all relevant prior art. *Hewlett-Packard Co. v. Tel-Design Inc.*, 460 F.2d 625, 628 (9th Cir. 1972). The purpose of the presumption is to accord due deference to the decision of the patent office to issue a patent. The reason for the exception to the presumption, where prior art is a crucial issue, is that the patent office is dependent upon the applicant's disclosure of relevant prior art. When the applicant fails to bring relevant prior art to the attention of the patent examiner, that individual is likely to remain ignorant of it, and lack necessary facts to correctly rule on the issuance of the patent. If this has occurred, the court is not entitled to rely upon the expertise of the patent office and so the presumption of validity is dissipated. Further, the failure to cite relevant prior art to the patent office can, where it is intentional and egregious, result in the invalidation of the entire patent on

1. Laitram originally filed this action against three defendants: Alaska Packers Association, Inc., Depoe Bay Fish Company and Hoy Brothers Fish and Crab Company. Alaska Packers joined Ray Skrmetta as a third party defendant on an indemnification theory, as a result of Skrmetta's implied warranty that the machines he leased to Alaska Packers did not infringe the Laitram patent. Alaska Packers and Hoy subsequently resolved their differences with the plaintiff and dismissed the third party complaint against Skrmetta. Pacific Pearl moved to join as defendant later, on the ground that it used a process basically identical to that of Depoe Bay. That motion was granted.

the grounds of the inequitable conduct of the applicant. *Beckman Instruments, Inc. v. Chemtronics, Inc.,* 428 F.2d 555, 565–6 (5th Cir. 1970), *cert. denied,* 400 U.S. 956, 91 S.Ct. 353, 27 L.Ed.2d 264 (1970).

In the present case, the defendant asserts that the plaintiff did not cite to the examiner a relevant reference, a patent granted in Sweden to Ralph Blomstrom. For reasons which appear more fully below I conclude that this failure does not dissipate the presumption of validity of the patent. It was *not* "prior art" in the technical sense of that term, and its disclosure was cumulative of other prior art actually cited. *Saf-Guard Prods. v. Service Parts, supra,* p. 1271 (Non-citation of alleged art which is cumulative of art actually cited does not weaken presumption of validity). I therefore conclude that the presumption remains and the defendants must prevail by "clear and convincing" evidence on all of their defenses which incorporate matters initially considered by the patent office. The presumption does not apply to the defendants' "wrong inventor" defense, the claim that Lapeyre was not in fact the inventor of the patented process. The patent office could not have considered that matter since it did not know of the Blomstrom patent, and I conclude that the burden of proof on that issue is by a "preponderance of the evidence." The burden of proving derivation of the invention is on the defendant. *Hedgewick v. Akers,* 182 USPQ 167, 169 (1974) (Party asserting derivation has burden of proof).

## III.  *The Patent is Not Obvious*

The test for obviousness under 35 U.S.C. § 103 is whether differences between the prior art and the claimed invention would have been obvious to a person reasonably familiar with the pertinent art. *Graham v. John Deere Co.,* 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–4, 15 L.Ed.2d 545 (1966). The application of this test requires three findings of fact: first, the nature of the prior art must be ascertained; second, the differences between the prior art and the subject of the patent must be adduced; and third, the level of skill in the pertinent art must be determined. *Id.* at 17, 86 S.Ct. at 694.

## A.  *The Nature of the Prior Art*

The '878 patent represents a material and patentable advance over the prior art. The relevant prior art considered by the patent office includes numerous references to shrimp peeling machines designed for the peeling of *raw* shrimp. Such references included the Lapeyre patents 2,429,-828; 2,537,355; and 2,574,044; as well as others. These patents were, as stated, directed to the peeling of the larger, warm-water panaeid species. The smaller pandalid species cannot be peeled raw and then cooked with acceptable commercial results. There existed a long-felt and recognized need for a method by which the pandalid species, which are harvested in cold-water areas, could be cooked and *mechanically* peeled. The relevant prior art also included the cooking of the pandalid species followed by *hand* peeling, which was the custom in Scandinavia and the Northwestern United States. Attempts to combine cooking of pandalid shrimp with mechanical peeling were unsuccessful until Lapeyre devised this patented process. Unsuccessful attempts included those of the German Peuss, the Swede Blomstrom, and, as he admitted on the stand, the American Ray Skrmetta.

Lapeyre's experience told him that to effectively machine peel shrimp, it would be necessary to first cook the shrimp, then cool it by immersion in water and then subject it to the peeling machine. Lapeyre does not profess to know the precise principle which brings success, although he points to "condensation" within the shell. He theorizes that when hot shrimp are subjected to cooler water the body fluids condense between the meat and shell, providing the lubrication needed for machine peeling. An inventor need not know the exact properties of physics which underlie the invention; what is necessary is that the process not be "obvious" to one skilled in the art.

That prior art consisted of mechanical peelers for raw and cooked shrimp, and the

well-known practice of hand-peeling cooked shrimp. The patent office pointed to the teaching of the Good Housekeeping Cookbook for the latter point. The prior art was reflected in the Blomstrom patent as well; Blomstrom's machine included precooking the shrimp in an attached cooker. Lapeyre did not bring this patent to the examiner's attention. The patent office had, however, previously denied Lapeyre's application for a patent for placing the cooker next to the peeler, as obvious over the prior art:

> Claims 29, 30, 32–35 and 38 are rejected as unpatentable over either the Lapeyre patents taken with Beauvais with attention directed to Envoldsen, Peuss, or Henning, all of whom show the teaching of cooking shrimp prior to peeling. Correspondingly, it is thought obvious to one with ordinary skill in the art to combine the cooker of Beauvais with the peeler of Lapeyre in accord with the teachings of Peuss, Envoldsen or Henning.

Lapeyre patent file history, pp. 43–44.

Thus the patent office obviously considered all the salient features of the Blomstrom patent. I therefore find that the non-citation of the Blomstrom patent does not dissipate the presumption of validity of the patent. Although it would have been the better practice to bring this reference to the attention of the examiner, the failure to do so is not fatal since the patent office considered relevant prior art to which the Blomstrom patent is merely cumulative. *Saf-Guard Prods. v. Service Parts, supra,* p. 1271. Further, the Blomstrom reference is not technically "prior art" but merely evidence of the level of skill in the pertinent art because this foreign patent was not granted until November 8, 1962, long after the Lapeyre filing, *see* 35 U.S.C. § 102(b); *CITC Industries v. Manow,* 193 USPQ 366, 370 (S.D.N.Y.1976). I have considered it as evidence of the level of skill in the art, and in terms of the applicant's affirmative duty of candor to the patent office. There was no violation of the duty of candor. Lapeyre knew that Blomstrom had applied for a patent for a shrimp peeling machine, but the Blomstrom patent disclosed nothing more than did the other prior art cited to and considered by the examiner. The facts here differ from those of *Aktiebolaget Celloplast v. Italmar Plastic Products,* 193 USPQ 299 (1977), relied on by defendants, in which the applicant deliberately suppressed the *most pertinent prior art reference,* a foreign patent which was "precisely the item of prior art which the examiner's critique pointed to . . . ." *Id.* at 304.

■ The defendants also claim that an affidavit in support of plaintiff's patent, sworn by one Strasburger, was false and misleading. That affidavit was prepared to rebut a possible prior art reference by one Higgins, to the effect that he had seen mechanical peeling of cooked shrimp in the Gulf Coast States in the 1930s. Strasburger swore that the information in the Higgins reference was in error, and the defendants have not seriously challenged that assertion. The defendants claim, however, that statements made by Strasburger concerning the Gulf Coast shrimp processing industry would have misled the patent office into thinking that Strasburger referred to areas other than the Gulf, and to shrimp peeling practices undertaken in cold-water areas such as Alaska. I find that the Strasburger affidavit, taken in its proper context, does not mislead.

The defendants also assert certain other misrepresentations, but I find no such misrepresentations were made to the patent office.

## B. *Differences Between the Prior Art and the '878 Patent*

■ The differences between the '878 patent and the prior art is that Lapeyre subjects the steaming hot shrimp to immersion in cold water, and immediate peeling. This is the crucial feature of the invention, whether it is explained in terms of "condensation" or of a "fluid body," within the shrimp. Lapeyre used both explanations. The defendants take the position that "condensation" cannot occur, because the shrimp shells have already opened by the time they contact the cooler water after cooking. Defendants argue that there could be no condensate formed on the interior of the shells.

There is a conflict in the testimony as to whether a condensate forms in any meaningful amount. However, it is clear that the process works. The court, at the invitation of the defendant Depoe Bay, observed the peeling of shrimp at its Newport, Oregon plant. When shrimp were dropped immediately from the cooker to the cool water and the peeler, they were peeled satisfactorily. When the shrimp were intercepted on their way from the cooker to the peeler and allowed to cool slowly, they did not peel satisfactorily. The defendants later asserted that this phenomenon was not related to "condensation," but to the *drying* of the shrimp meat as it cooled. Implicit in that statement, of course, is the premise that a fluid layer in the shrimp would be beneficial. Since Lapeyre uses "condensation" only as a way of describing the beneficial effects of the fluid layer, I find that "condensation" does "form" and assist in the peeling of the shrimp. This is the essential difference between Lapeyre's invention and the prior art.

### C. The Level of Skill in the Pertinent Art

The level of skill in the pertinent art is exemplified by the shrimp peeling device of Blomstrom, Lapeyre's prior machines under older patents and by the Peuss and Skrmetta attempts. This was the level of skill in the shrimp peeling and food processing profession in 1959 and immediately before. Despite the long-felt need for a workable method by which pandalid shrimp could be cooked and mechanically peeled, the invention evaded all but Lapeyre. This, obviously, is strong evidence that the patent is not invalid for obviousness. *Graham v. John Deere, supra,* 383 U.S. at 17–18, 86 S.Ct. at 693–694; *Young Corp. v. Jenkins,* 396 F.2d 893, 894 (9th Cir. 1968). Also important is the proof of commercial success of the Laitram process, which has been widely licensed in the United States and overseas. While these considerations are secondary, and do not indicate the presence of invention, they are relevant to my decision.

I conclude, based on the discussion of the prior art, patent features, and level in the skill of the art which I have undertaken above, that the '878 patent is not invalid for obviousness.

### IV. The Patent is Useful

■ The defendants assert that the Laitram patent does not meet minimum standards of patentability under 35 U.S.C. § 101 because its material features are not "useful." Specifically, defendants assert that "the amount of water that could *possibly* form inside the shell and be attributable to condensation is insignificant." Defendants' Trial Brief at 22 (Emphasis in original). It is the defendants' position that the "peelability" of shrimp is affected principally by a commercial process of aging and degradation in ice storage. The storing of the shrimp in ice and icy water for up to three days prior to peeling does indeed appear to expedite the peeling process. This fact does not render the patent invalid. The patent is in wide use under licenses throughout the world. The demonstration at the defendants' plant showed the utility of the process. I conclude that the patent is not invalid for lack of utility, *cf. Gross v. General Motors Corp.,* 521 F.2d 45, 48–49 (1st Cir. 1975).

### V. The Patent is Not Invalid on the Grounds of "New Matter"

■ Defendants assert that the patent is invalid because the material patentable feature, "condensation," was not disclosed to the patent office until more than one year after the invention was placed in public use. This "new matter" defense derives from *Muncie Gear v. Outboard Marine,* 315 U.S. 759, 62 S.Ct. 865, 86 L.Ed. 1171 (1942), and from *Aetna v. Southwest Products,* 282 F.2d 323 (9th Cir. 1960), *cert. denied,* 365 U.S. 845, 81 S.Ct. 804, 5 L.Ed.2d 810 (1961). Under *Aetna,* Lapeyre's use of the term "condensation" in the claims first filed in early 1964 might be characterized as "new matter" under *Muncie Gear.* However, *Locklin v. Switzer,* 299 F.2d 160, 167 (9th Cir. 1961) holds that a claim including a refinement necessary to distinguish prior art will not invalidate the patent, if the refinement is sufficiently set forth in the application as originally filed. It is noteworthy that Lapeyre *did* disclose to the patent office, in his 1960 application, that

"The thermal treatment of the cooking step of my process induces and promotes the formation of the accumulation of fluid between the cooked meat and the outer shell. I have found that the shrimp are peeled with greater facility when this fluid exists between the shrimp meat and shell." Lapeyre file history at 3. I find that the refinement of this claim to "condensation" did not introduce "new matter" into the patent application.

## VI. *Lapeyre is the Inventor of the Process*

The defendants contend that Lapeyre is not the inventor of the process, but that he derived it from Blomstrom. The plaintiff is not here aided by a presumption of patent validity.

The evidence showed that Blomstrom had been seeking, unsuccessfully, to develop a process for peeling precooked pandalid shrimp in the late 1950s, before his first contact with Lapeyre. When Lapeyre visited Scandinavia and Blomstrom's plant, he saw parts of a disassembled peeler. Blomstrom told Lapeyre that he was working on a peeling machine and that he had applied for a patent on the process. Despite this, Blomstrom provided Lapeyre with a place to work in his plant. When Lapeyre developed his process, Blomstrom sought an exclusive license for the process in Scandinavia. In the early 1960s, Blomstrom wrote several letters to Lapeyre asserting that he, Blomstrom, had in fact invented the Lapeyre process. However, Blomstrom did not testify at trial, was not deposed and does not presently appear to assert any claim to the process. Blomstrom's company is now a licensee of the Laitram process. I find that plaintiff has prevailed on this issue as well. The evidence before me indicates that Lapeyre is the inventor of the patented process, and that Blomstrom acquired a Swedish patent for another process which did not become commercially successful.

## VIII. *There was no "Misuse" of the Patent*

Approximately one month before trial of this matter the defendants sought to amend the Pre-trial Order to assert a counterclaim for patent misuse coupled with an "anti-trust" claim. The plaintiff objected to the insertion of the issue into the case at the eleventh hour, and I struck the counterclaim. At the time of trial, however, defendants introduced evidence of patent misuse as a defense to the infringement action. There was no objection from plaintiff. I will, therefore, rule on the patent misuse issue. The plaintiff charges a license fee for the use of its process which is calculated in terms of the number of pounds of "shell-on," unpeeled shrimp subjected to the process. Laitram has been required by the Federal Trade Commission (FTC) to make its license fees uniform throughout the country, see *LaPeyre v. F.T.C.*, 366 F.2d 117 (5th Cir. 1966). Defendants' contention is that the charging of a uniform per-pound rate throughout the country discriminates against Northwest peelers, because the royalty is based on *unpeeled* shrimp poundage. Since, as a rule, the Northwest pandalid species lose more of their weight in the cooking and peeling process than other shrimp do, the defendants argue that the license fee is discriminatory. Defendants assert that only a rate calculated in terms of the poundage of *peeled* shrimp would be fair.

The evidence at trial showed that post-peeling yields vary greatly, even in the Northwest. A wide variety of factors affect the yield, which varies from place to place even in the defendant Pacific Pearl's area of operations. I believe that the defendants' misuse argument is not well taken. The defendants would have the patent declared unenforceable *because* a uniform rate is charged. If Laitram were to adjust its royalty rate to account for the generally lower yields of the Northwest, it could also be required to adjust its rate for higher quality shrimp which command a higher price in the marketplace, or where higher fuel costs make it more expensive to produce a pound of peeled shrimp. I reject as unfounded the contentions of the defendants concerning patent misuse.

## VIII. *The Patent was Infringed by Both Defendants*

The defendant Pacific Pearl argues that it does not infringe the patent because

"the information of condensation as claimed in the '878 patent does not affect the peelability of precooked shrimp." Defendants' Trial Brief at 25. I have previously rejected these contentions. The defendant Depoe Bay argues an additional ground for non-infringement in that it uses a "warm water spray" in its peeling operations. This "warm water spray" was devised by Skrmetta allegedly to clear the peeling rolls of accumulated shrimp residue. No other peeler, apparently, experiences this problem or has devised this solution. The "warm water spray" is relevant in that the defendant Depoe Bay argues that the use of higher-temperature water must necessarily lessen the extent of the "condensation" attributable to the impact of the hot shrimp on the cooler peeling rolls, and must therefore lead to a finding of non-infringement. It is true that the Laitram patent calls for the use of water "... of the order of 40°–70° F. depending on temperature of city or well supply." Lapeyre File History at 19. Depoe Bay's Skrmetta-devised spray is roughly 100°–130° F. However, aside from the plaintiff's suggestion that the spray is a sham devised for purposes of this litigation, it is not even used uniformly at Depoe Bay, and may be disengaged manually at the discretion of the operator. Further, to the extent the spray is used it may only lessen the extent of "condensation," not prevent it.

I hold that the patented process is infringed by Depoe Bay, and that any modifications of the process practiced there are not material to the infringement.

IX. *The Reasonable Royalty*

Under 35 U.S.C. §§ 283 and 284, the court is required to set an amount of damages "adequate to compensate for the infringement, but in no event less than a reasonable royalty ..." In setting such a royalty I have considered the factors set forth in *Georgia-Pacific Corp. v. U.S. Plywood*, 318 F.Supp. 1116, 1117–1123 (S.D.N.Y.1970). A most salient feature of this case is the fact that for almost the entire period of the patent, the standard license fee was set at $3.00 per thousand pounds of shrimp subjected to the process. Only when the patent's expiration approached was the rate doubled to $6.00 per thousand by plaintiff. This higher rate was paid with great reluctance by a number of commercial peelers, and some refused to pay. Of the latter group, several were parties to this suit when filed. I find that the rate of $3.00 per thousand accords most closely with the idea of a reasonable royalty, and I award damages at that rate. While the plaintiff seeks a much higher rate, the best evidence of reasonableness is the long-standing royalty rate set by the plaintiff before the sudden increase.

Plaintiff also argues that it should receive punitive damages, treble damages and attorney's fees. Such damages and fees may be awarded in exceptional cases where infringement is willful and in bad faith, or where the case is aggravated by other factors. This is not such a case. The defendants honestly believed that the patent was invalid and uninfringed.

This opinion shall serve as findings of fact and conclusions of law under Fed.R.Civ.P. 52(a).