**A. Shepard TITCOMB, Plaintiff,**

**v.**

**NORTON COMPANY, Defendant.**

**Civ. A. No. 6495.**

United States District Court
D. Connecticut.

Oct. 8, 1959.

Memorandum re Additional Findings and
Conclusions, Dec. 30, 1959.

Richard Spencer, of Blair, Spencer &
Buckles, Stamford, Conn., for plaintiff.

Daniel L. Morris, of Curtis, Morris &
Safford, New York City, for defendant.

J. JOSEPH SMITH, Chief Judge.

*Findings of Fact*

1. Plaintiff, A. Shepard Titcomb, is and was at the time of commencement of this action a citizen and resident of Connecticut.

2. Defendant, the country's largest abrasive manufacturer, is a Massachusetts corporation doing business in Connecticut.

3. The matter in suit involves more than $3,000 exclusive of interest and costs.

4. Plaintiff Titcomb was experienced since 1941 in the sales and distribution of abrasive grinding wheels, chucks and segments, incorporating his business as a distributor about 1943 as "Abrasive Associates, Incorporated".

5. One method commonly used in the surface grinding and polishing of metals was a vertical spindle grinder, revolving against the face of the work to be ground a solid ring molded of abrasive material and a suitable bonding agent, the abrasive ring being held by a holding device or chuck attached to the revolving vertical spindle.

6. It was found economical and desirable to substitute for the solid ring one made up of segments, and chucks were constructed by various machine tool manufacturers adapted to hold segmented rings.

7. The shapes of the segments and the holding elements of the chucks varied somewhat as better functioning and more safety in use were sought.

8. Some chucks and segments were so designed that a single segment size and shape could be used in chucks of several different diameters, but no great degree of standardization of segment size and shape for use in any manufacturers' whole range of chuck sizes had been attained prior to Titcomb's development described herein.

9. Distributors of abrasive segments were required by the needs of their various customers to carry segments made of abrasive particles of different sizes and hardness.

10. This, combined with the need to carry different size segments for each of a number of chucks of different circumferences, posed a substantial inventory problem for distributors in the trade.

11. In the use of abrasive rings and segments in the grinding and polishing of metals, the debris from the grinding, consisting of chips ground off the metal surface and abrasive particles broken loose from the grinding surface, the debris being known as swarf, has a tendency to become packed into the interstices of the grinding surface.

12. This packing of the grinding surface, known as loading, results in a smoother, less efficient cutting surface.

13. The loading of the cutting surface requires periodic dressing of the cutting surface to restore its cutting and grinding efficiency.

14. Plaintiff, somewhat familiar with small boat design, conceived of a type of chuck and shape of segment which he believed would make possible greater standardization of segment sizes and by a plowing action similar to the bow action of a small boat on the water, eliminate to some degree the intrusion of swarf between the grinding surface and the surface to be ground, lessening the frequency of needed dressing of the grinding surfaces and down time of the machines.

15. Titcomb took a shape somewhat similar in horizontal section to a double ended small boat, bent it to a crescent or banana shape because of the rotary motion of the grinding chucks for which it was designed, and placed segments built on that horizontal section in a chuck in positions on the base plate which positions he described as "circular echelon", with the leading edge (in the direction in which the chuck was to revolve) inward toward the center of the disc, with space between the segments designed to allow the swarf suspended in the coolant to escape outward.

16. Drawings embodying the idea were completed in February 1946.

17. During that month plaintiff discussed with Price, district manager of defendant in Detroit, the possibility of employment of plaintiff by defendant while plaintiff worked out some new ideas he had.

18. Price arranged a meeting between plaintiff and Curtis, defendant's sales engineering manager, later in February 1946.

19. Curtis would not discuss any new development of plaintiff's for fear it might conflict with any work defendant might be doing in the same field, but promised to speak with Johnson, defendant's vice president, concerning possible employment of plaintiff. Later Curtis wrote plaintiff that he had spoken to Johnson, but there was then no opening for employment of plaintiff.

20. Plaintiff then went to Providence and obtained an agreement from McLeod, president of Abrasive Machine Tool, a former employer of plaintiff, to manufacture an experimental chuck for plaintiff if a patent search was favorable.

21. Application for patent which became U. S. Patent 2,476,334 was made June 27, 1946.

22. A chuck was made for plaintiff by Abrasive Machine Tool, and abrasive segments for use therein by American Emery Wheel Works of Providence, R. I.

23. In October 1946 tests were run at Blanchard Machine Co. in Cambridge, Massachusetts.

24. American Emery Wheel produced segments of the same design but of different specifications which were tested in December at the Langelier Mfg. Co. plant at Cranston, R. I.

25. Plaintiff also obtained segments on his design for test from Carborundum Company.

26. Additional tests were run at Langelier in March 1947.

27. In March 1947 defendant loaned plaintiff a Norton chuck for comparative tests with plaintiff's chuck and segments.

28. Plaintiff devised two sizes of segments, one called AA–1, some 11 inches in its largest horizontal dimension, for chucks from 14 inches to 60 or more in diameter, the final dimensions of which were arrived at and frozen on April 4, 1947, the other, called AA–2, about 4 inches in its largest horizontal dimension, for chucks 12 inches in diameter or smaller.

29. The particular form of AA–2, the smaller segment, proved unsatisfactory and was later supplanted by a new AA–2.

30. Drawings and models of both the AA–1 and the original AA–2 were shown Curtis on July 10, 1947.

31. In accordance with the custom of the trade, a customer's drawings of a segment under development were understood by Norton to be received in confidence.

32. For the Chicago Tool Show scheduled for September 1947 defendant manufactured for plaintiff AA–2 segments on a "development, no charge" basis.

33. Carborundum and Macklin also made segments for plaintiff for the show on a similar basis.

34. Sales of chucks and segments for use therein were made by plaintiff at the Chicago Tool Show in September 1947.

35. Plaintiff and his licensees have made and sold to date some 600 chucks of the AA–1 design to some 450 grinder users.

36. Defendant used the AA–1 drawings received from the plaintiff on July 10, 1947 as the basis for its manufacture of segments to sell to owners of Titcomb chucks, modifying the segment shape in successive steps to eliminate the sharpness of the ends for ease in manufacture, and changing the shape slightly to strengthen the segment.

37. Segments are purchased to the specifications of the abrasive manufacturers as to the hardness of the abrasive material, sharpness of particles and bonding qualities of the bonding agent.

**12**

38. Purchasers of segments from Norton expect the segments to be of Norton's manufacture, although designated as AA or Titcomb segments.

39. All segments sold by Norton were stamped with Norton's name, although some were sold to fit Titcomb chucks and referred to in Norton catalogues and by Norton salesmen as AA or Titcomb segments.

40. The defendant does not manufacture the Titcomb chuck, but does manufacture and sell segments intended to fit and to be used in the Titcomb chuck, having obtained segment drawings for both the early AA–2 and the AA–1 segments at the time it undertook to make AA–2 segments for Titcomb on a development, no charge basis, and having later purchased A–1 Titcomb clamp bodies for the purpose of checking the fit of the segments manufactured and sold by Norton under the AA or Titcomb catalogue designation. Norton so describes the segments in the catalogues issued to its salesmen and to the trade.

41. The Norton segments were somewhat modified for ease in manufacture by blunting the ends and were fattened or "beefed-up" slightly for strengthening purposes.

42. The modification of the end shape did not affect the fit of the segments in the clamp bodies of the chuck.

43. The "beefing-up" was not a sufficient alteration to prevent proper fit in the original chuck, but some clamp bodies developed in later embodiments of the design by Titcomb have varied sufficiently from the original so that when taken in conjunction with Norton's variation from the original by the "beefing-up" proper fit is difficult or impossible.

44. We do not have accurate measurements to determine the amount of variation of the later chuck clamp bodies from the original, although so far as appears, the segments made to the dimension of the frozen design for the AA–1, Ex. 13R, will work in combination with the later clamp body variations.

45. Patent 2,476,334 for an abrasive wheel issued to Titcomb July 19, 1949 on an application filed June 17, 1946. Two claims of this patent are in suit, Claims 4 and 17, which are as follows:

"Claim 4: The method of making a plurality of grinding discs having different diameters from a plurality of identical abrasive segments which comprises using a variable number of segments in the wheels according to the diameter thereof, but in each disc arranging the segments with the leading ends thereof inwardly and the trailing ends thereof outwardly of a circle whose center is the axis of said disc, said segments being placed with a space between the segments sufficient to permit the outward discharge of debris by centrifugal force and physical displacement.

"Claim 17: An abrasive disc comprising a wheel body for rotation about an axis, said wheel having a plurality of bonded abrasive projections, each of said projections being shaped as a pseudo-hollow cylindrical segment bounded by two arcs, said arcs each being substantially equidistant through their course from an arcuate median line, the arcs of each being modified equally at each end through a merging of the interior arc into substantially flat planes carried to the median line and from a merging of the exterior arc into arcs of lesser radius carried to meet the substantially flat planes merged with the interior arc at the median line, thus forming on each end of each projection, acutely angled ends, said projection being located cooperatively in circular echelon relationship, one being in advance of the other in the general direction of travel of said projections and so disposed with the leading end of one inwardly of the trailing end of the next, and with space between said projections to provide a pas-

sage outwardly for chips and debris."

46. Patent 2,501,422 for an abrasive block or segment issued to Titcomb March 21, 1950 on an application filed June 1, 1949, as a continuation in part of the application for the wheel patent which became 2,476,334. Patent 2,501,422 reissued as Re 23,364 on May 8, 1951 on application filed October 31, 1950, reissued again as Re 23,558 on September 30, 1952 on application filed March 6, 1952, reissued again as Re 23,717 September 29, 1953 on application filed May 7, 1953.

Claims 6 and 7 of Re 23,717 are in suit.

Claim 6 is as follows:

"A bonded abrasive block shaped as a pseudo hollow cylindrical segment comprising leading end, center portion and trailing end, said center portion being formed between inner and outer generally arcuate surfaces, both perpendicular to an end surface and each respective leading and trailing end being similar and formed by converging continuations of the inner and outer arcuate surfaces of said center portion into substantially sharp ends and wherein said outer arcuate surface is comprised of arcs extending inwardly from the formations of said sharp ends to positions along said outer arcuate surface bordering the mid areas which consist of the center portion and substantially one-half of the leading and trailing portions adjacent thereto along said outer surface where they merge into a flatter joining surface."

Claim 7 is as follows:

"A bonded abrasive block as in claim 6 wherein the ends of said inner arcuate surface of said center portion join flat planes on said leading and trailing portions."

47. Defendant has failed to establish that Titcomb intentionally falsified the statements under oath in the reissue applications.

48. During the prosecution of the application for the third reissue plaintiff filed with the Patent Office a copy of his drawing of April 4, 1947, giving the final dimensions of the AA–1 segment.

49. Pursuant to Patent Office practice, this became available for public inspection upon reissue of the third reissue, Re 23,717 on September 29, 1953, although it was not printed by the Patent Office or otherwise published by it.

50. It is possible without great difficulty to reproduce the measurements of a Titcomb AA–1 segment from segments produced and sold by Titcomb's licensees, and to manufacture in accordance therewith segments for use in Titcomb chucks.

51. The segments are designed to wear out in use and to be replaced by the insertion of new segments in the clamp bodies of the original chuck.

52. Titcomb has from time to time improved the design of the clamp bodies to be mounted on the base plate of the chuck to hold the abrasive segments, for greater ease in changing clamp bodies and segments, and improvement in operation of the chuck.

53. The new clamp bodies have on occasion varied somewhat from the dimensions of the original clamp bodies, but are intended to and do operate effectively with segments of the shape and dimensions of the drawing of April 4, 1947, Ex. 13R.

54. Plaintiff has failed to establish damage to him by reason of failure of Norton-made segments described as AA or Titcomb segments to fit the altered clamp bodies of the new Titcomb chucks.

55. General Electric acquired an AA–1 chuck and segments in the summer of 1948, from Shuttleworth, representative of a licensee of Titcomb, on a trial basis.

56. In 1949 Titcomb, having heard that 600 Norton-made AA–1 segments had been returned to Norton by General Electric as unsatisfactory, went to Norton with suggestions on how to improve the Norton segments for General Electric during this period.

57. No request was made of General Electric to keep confidential the segment dimensions.

58. The following prior patents, prior publications and prior uses were offered and received in evidence:

## UNITED STATES PATENTS

| | | |
|---|---|---|
| Harrison | 863,172 | (Ex. F) |
| Harris | 797,427 | (Ex. G) |
| Meyer | 2,307,632 | (Ex. BL) |
| Leshure | 2,082,404 | (Ex. J) |
| Campbell | 1,195,555 | (Ex. I) |
| Fitch | 97,494 | (Ex. H) |
| Hyde | 1,589,855 | (Ex. BE) |
| Bucheister | 1,868,492 | (Ex. BI) |
| Gardner | 1,027,536 | (Ex. BM) |
| Skillings | 1,767,321 | (Ex. BN) |
| Hyde | 1,589,855 | (Ex. BE) |
| Hyde | 1,133,475 | (Ex. BF) |

## FOREIGN PATENTS

| | | | |
|---|---|---|---|
| Remuzzi | (Italian) | 359,974 | (Ex. BB) |
| Ackerman and Schmitt | (German) | 460,920 | (Ex. BC) |
| Issler | (German) | 52,589 | (Ex. BD) |
| Findeisen | (German) | 595,219 | (Ex. BG) |
| Waterhouse | (British) | 10,903 | (Ex. BH) |

## PUBLICATIONS

Harrison Supply Company, Inc. Catalog of 1904
Pages 97 and 112        (Ex. 33)

Harrison Supply Company Catalog of 1907
Pages 55–60        (Ex. 36)

Harrison Supply Co. Catalog No. 4
Pages 67–72        (Ex. 34)

Harrison Bros. Catalog
Pages 30–31        (Ex. 35)

Cavicchi Pamphlets        (Ex. CH, CI)

Grinding Wheel Institute Pamphlet  (Ex. 2)

## PRIOR USES

Cavicchi Polishing Machinery Co.
Eccles, Smith & Co.

---

59. Claims 4 and 17 of patent 2,476,334 and claims 6 and 7 of patent Re 23,717 do not involve invention over the prior art.

### Conclusions of Law

1. The court has jurisdiction of the parties and subject matter of the action.

2. Claims 4 and 17 of the U. S. Patent 2,476,334 for an abrasive wheel issued to Titcomb July 19, 1949 are invalid for want of invention.

3. Claims 6 and 7 of U. S. Reissue Patent Re 23,717 issued to Titcomb September 29, 1953 are invalid for want of invention.

4. Norton received the drawings of the AA–1 segment, from which its segments were manufactured, in confidence for the purpose of producing development segments for Titcomb.

5. Production of segments for sale in violation of confidence is an actionable wrong and a breach of an implied agreement not to use the drawings for other than Titcomb's development purposes.

6. Production of segments by Norton for General Electric with Titcomb's consent while General Electric was determining the usefulness to it of the development was not a wrong to Titcomb.

7. The publication of the confidential information through sale of segments in quantity to General Electric with Titcomb's consent terminated Norton's duty not to use the information for other than Titcomb's development purposes.

8. To the claim for the tort of violation of confidence the Connecticut three-year statute of limitations applies.

9. To the action for breach of implied contract the Connecticut six-year statute of limitations applies.

10. The above statutes bar claims for acts more than the statutory period prior to the commencement of the action.

11. Defendant is entitled to judgment dismissing the action with costs.

### Discussion

This action is in three counts, for alleged patent infringement, unfair competition and breach of contract. Jurisdiction is based on a federal question on the patent count, diversity of citizenship and jurisdictional amount on the other counts.

The patent counts are based on claims 4 and 17 of U. S. Patent 2,476,334 for an abrasive wheel issued to plaintiff July 19, 1949 on an application filed June 17, 1946, and claims 6 and 7 of U. S. Reissue Patent Re 23,717 issued to plaintiff September 29, 1953, for an abrasive block or segment, the third reissue of Patent 2,501,422, which was itself issued March 21, 1950 on an application filed June 1, 1949, as a continuation in part of the application for the wheel patent which became 2,476,334.

Defendant raises the issue of statutes of limitations on the breach of confidence and contract claims. The court will apply the conflict of laws rule of the forum. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477. Defendant contends that either the Connecticut three-year statute, Conn. G. S. Revision of 1949, Sec. 8316, or the Massachusetts two-year statute c. 260, §§ 2A, 4, would bar the action for violation of confidence. Since the limitation is not an integral part of a statute creating the right to recover in tort, Connecticut presumably would apply its own three-year statute, although both the disclosure and the manufacture in breach of confidence occurred without the forum, and the substantive law to be applied is that of Massachusetts. The Pillsworth letter of April 20, 1950 gave notice of the manufacture under a claim of right by Norton. This action was commenced December 29, 1956 and recovery can be had on this claim only if each manufacture is considered a new breach or if the statute is in some manner tolled.

Although negotiations took place after the letter of April 20, 1950, Titcomb was on notice of Norton's claim of right to manufacture, and subsequent events were not of a nature to toll the statute or estop Norton from asserting it. Plaintiff contends, however, that in the case of a continuing tort, or continuing breach of an implied contract, recovery may be had for the statutory period prior to commencement of action. This position appears well taken. Aktiebolaget Bofors v. United States, 1957, 139 Ct. Cl. 642, 153 F.Supp. 397. Midy v. Midy Laboratories, 1948, Sup.Ct.N.Y., 77 U.S. P.Q. 429.

So far as the claim based on express or implied contract is concerned, no express contract is found and the implied obligation, if any, would first arise at the first manufacture for sale more than six years before suit and the six year statute of either Connecticut or

Massachusetts would be a bar unless a new obligation arose at each succeeding manufacture, or unless in some manner tolled. This is a continuing breach if established, so that the statute would bar recovery only for breach prior to December 29, 1950.

Turning to the defenses on the merits, a number of defenses are advanced to the claims of infringement. Chief among them is a denial of invention over the prior art.

■ Titcomb's development of a segment shape defined in the segment patent and in claim 17 of the wheel patent, its positioning on the chuck and the use of one size segment on chucks of a number of different diameters defined in claim 4 of the wheel patent, represented an advance in the art in several respects. It carried standardization forward to a point where two segment sizes were sufficient in practice for chucks of all commonly used diameters. By the "plow" action it facilitated the throwoff of swarf, as illustrated by the spark streams of the exhibits, and the evidence leads to a conclusion that it more probably than not in some degree reduced loading and increased grinding efficiency. Whether there is any significant difference in sharp, full sharp or rounded points, or in the claimed one third–two thirds relationship is not established. These appear to be distinguishing features claimed solely to differentiate from the prior art. Standardization—the use of segments of one size in varying numbers to make abrasive wheels of differing diameters— was old in the art. Its further development by Titcomb by his positioning of the segments in so-called circular echelon was not so great and difficult a forward step as to require invention. Nor was the improvement in disposal of swarf demonstrated to be a goal extensively sought after by the industry over an extended period.

As is usual, defendant's counsel, casting back over the years, has produced earlier devices with some similarities to and some dissimilarities from Titcomb's development. Both in the stone grinding and polishing, and glass grinding patents, i. e., Harris, Harrison, Waldron, something like a plowing action is used to direct the abrasive material or debris, although there the purpose is to retain it in contact with the work, so it is directed inwardly rather than expelled outwardly as in Titcomb. Leshure (Cortland) and Meyer have segments which might function as Titcomb's, if positioned as are Titcomb's. They differ, however, in that they show a flat plane on one side, and in manner of use and do not function similarly. Issler (Swiss) is a stone grinding device which allows space for the mud to run out between segments and in which contact is continuously maintained by overlapping of segments, but the segment shapes do not resemble Titcomb's. Waterhouse (Eng.) provides channels for escape of debris, but no similarity in segment shapes. The arcuate form of the Pratt & Whitney (Hoagland) (Eng.) patent lacks the boat prow and the "circular echelon" arrangement. Remuzzi (Ital.) and Ackerman & Schmitt (Ger.) relate to the manner of attachment of the segments to a support. None of them, however, use the same construction in the same manner toward the same end as Titcomb.

Norton contends that claim 4 of the wheel patent is anticipated by the illustration in Ex. 34, the Harrison catalogue. If Harrison could be used in either direction this is probably correct except as to the standardization element of claim 4, although Norton attempts to read out of claim 4 the "leading" and "trailing" ends references on the basis of a claimed admission by Titcomb on trial which hardly could be effective to that end. In view of the purpose of Harrison, the polishing of stone, it may be unlikely that there was a deliberate effort to throw off the debris, although we cannot be sure, in view of Issler's attempt to do just that. In any case, in view of the shapes available in the prior art, the recognition that the flow of debris may be directed by the segment shape, and the partial standardization known to the trade, Titcomb's contributions do not rise

to the level of invention, but partake more of the nature of improvements likely to occur to a mechanic skilled in the art putting forth his efforts toward the ends sought. Such improvements are not patentable. 35 U.S.C. § 103.

■ Claim 17 is attacked as not useful to eliminate the swarf by plow action. From the demonstrations, it would appear more probable than not that some advantage is gained by plow action, in spite of the opinion of Norton's witnesses to the contrary. In view of the fact that it had long been recognized that debris could be directed by the shape and positioning of segments, the development does not rise to the level of invention, and this advantage is not sufficient by itself to sustain the patent. No significant difference in segment shape from the earlier art, particularly Harrison and the Harrison catalogue photographs, is established, as to claims 6 and 7 of Re 23,717. These claims are also void for lack of invention.

The third reissue, Re 23,717, in suit is also attacked as invalid for false oaths. This is not established. While Titcomb may have been in error in interpreting the oath as referring back to the original application, there was no deliberate falsification or intent to deceive. It is attacked also because invalid through public use and sale of the invention described more than one year prior to the filing of the parent patent application which became 2,501,422, and for variance and broadening of the claims from the original. The last of these appears insufficient, for the approximate one third-two third relationship in the arcs of the outer surface found in claim 1 and the claims dependent thereon is an approximate relationship found in the original patent in the drawings, although it was brought in specifically to the claims to avoid prior art (Harrison). The claims relied on in Re 23,717 are invalid not because they contain new matter in a reissue, but because they lack invention over the prior art. The reissue in suit was applied for May 7, 1953, more than three years after the issue of 2,501,422 on March 21, 1950, and more than five years after the sale of segments at the Chicago Show of September 1947. There was no undue delay in application for each successive step, however, and no ulterior purpose, and no intervening right acquired by defendant.

■ 35 U.S.C. § 251 requires a reissue to be for the same invention as the original patent surrendered. Muncie Gear Works v. Outboard Marine & Mfg. Co., 315 U.S. 759, 62 S.Ct. 865, 86 L.Ed. 1171; U. S. Industrial Chemical v. Carbide & Carbon, 315 U.S. 668, 62 S.Ct. 839, 86 L.Ed. 1105; Parker and Whipple Co. v. Yale Clock Co., 123 U.S. 87, 8 S.Ct. 38, 31 L.Ed. 100; Seymour v. Osborne, 11 Wall. 516, 20 L.Ed. 33; Coon v. Wilson, 113 U.S. 268, 5 S.Ct. 537, 28 L.Ed. 963. While it may be said that this is true here, the clarification of the claims in the successive reissues narrowed them so as not to read on Norton's present version of the Titcomb segment. If it were held that the segment claims were valid, Titcomb would be estopped to claim that segments such as Norton's with flattened or blunt ends infringed, in view of his emphasis on completely sharp ends, formed by the intersection of two planes, to get away from Issler in the Patent Office proceedings.

If Norton infringed the claims of the wheel patent 2,476,334, it was as a contributory infringer because of its manufacture of segments for use in chucks sold by Titcomb or his licensee, for Norton never made a chuck on the Titcomb design, and so far as appears no one other than Titcomb or his licensees has ever made such a chuck.

Norton contends that the segments are expendable, consumable supplies for the chuck and that it is not an infringement to sell them to legitimate chuck owners. In degree of permanence, the segments are distinguishable from the safety razor blades of Gillette Safety Razor Co. v. Standard Safety Razor, 2 Cir., 64 F.2d 6 but not from the plane blades of Wilson v. Simpson, 9 How. 109, 50 U.S. 58, 13 L.Ed. 66, and certainly not from the abrasive stones of Micromatic Hone

Corp. v. Mid-West Abrasive Co., 6 Cir., 177 F.2d 934. This question is of importance, however, only if the wheel patent claims are valid and otherwise infringed by Norton's segments, and as appears above, we have found that they are not,

On the claim for unfair competition, Titcomb's principal claims are of (1) a disclosure in confidence of the dimensions of his segment and breach of that confidence by manufacture and sale of segments constructed for and sold to owners of Titcomb chucks, which chucks had been constructed and sold by or for Titcomb and his licensees under the patents in suit, (2) passing off of the segments as of Titcomb origin, (3) use of Titcomb's common law trademarks "AA" and "Titcomb", (4) damage to his business by furnishing of inferior segments of faulty shape on orders for "AA" or "Titcomb" segments.

■ The improvements, while desirable and commercially successful, do not involve invention over the prior art. They are, however, improvements developed by Titcomb and communicated to Norton for limited purposes only. Norton pretended to be interested in obtaining a license from Titcomb to use them, until the patents issued and Norton decided that it was safe to manufacture segments either because the patents were invalid on one ground or another or because the segments could be considered replacement parts which chuck purchasers were free to acquire from any source. This may be questionable business ethics and may give rise to some rights in Titcomb against Norton for breach of confidence. It cannot be the basis for recovery in express contract, for there plainly was never any meeting of the minds on payment by Norton for the development.

Norton did use Titcomb's distinctive segment shape with slight modifications for ease in manufacture. Of course essentially the same shape was necessary to fit Titcomb chucks. While in view of the early patents in related fields the shape of the segments was not entirely novel, it was identified in the trade as a Titcomb segment, and indeed referred to and advertised by Norton as such. Since segments are purchased by users in reliance on the abrasive manufacturers' specifications as to the characteristics of the abrasive material for hardness, sharpness of particles and bonding qualities of the bonding material, however, it is highly unlikely and certainly not proved that any buyer was confused as to the source of the segments purchased from Norton and bearing Norton's name. He may well have thought that Norton was a licensee of Titcomb, but this is not enough, since he knew Norton was both manufacturer and seller, and he depended on Norton for quality.

■ Any redress for violation of confidence, if found, necessarily would be limited to a period prior to public availability of the segments, for in the absence of patent or contract protection, when a use becomes available to the public it also becomes available to one who has obtained the necessary knowledge in confidence. Schreyer v. Casco, 2 Cir. 1951, 190 F.2d 921; Conmar Products Corp. v. Universal Slide Fastener Co., 2 Cir.1949, 172 F.2d 150; Picard v. United Aircraft Corp., 2 Cir.1942, 128 F.2d 632, unless this rule has been modified or abandoned by the court in Franke v. Wiltschek. Franke v. Wiltschek, 2 Cir. 1953, 209 F.2d 493 is a case of breach of confidence which is distinguishable upon its facts. There the formula and method of manufacture of a compressed fabric face cloth were disclosed in confidence, together with cost figures and other data obtainable only from plaintiff's books. Here the only secrets are the dimensions of the article and "the very putting of it upon the market destroys the secret of its production." (Schavoir v. American Re-Bonded Leather Co., 1926, 104 Conn. 472, 476, 133 Atl. 582, 583.) Having chosen to make the knowledge readily available, we think that the plaintiff can no longer hold Norton for breach of confidence, and that the consent to the furnishing of the segments to General Electric for trial and use in actual manufac-

turing operations, without restriction as to disclosure of their dimensions, easily obtainable by any draftsman from the segments themselves, ended the secret nature of the information and plaintiff's claim against Norton outside the patent. A claim based on any commercial sales by Norton prior to that date even if established, would be long barred by limitations.

It was demonstrated that a segment could be duplicated and placed in production without difficulty. There is a dispute as to when Titcomb segments or these measurements became publicly available. The plaintiff concedes that the measurements were furnished about November 1958 to the association of abrasive manufacturers known as the Abrasive Wheel Institute with permission to distribute to members, using the designation AA–1. He insists that the furnishing of prints to the Patent Office September 29, 1953 in the prosecution of the third reissue, and to the individual manufacturers Carborundum, Simonds, Macklin and American Emery Wheel in 1947 were not publications available to the public, the Patent Office copy because not printed for public use and the prints to Carborundum et al. because furnished in confidence in the development of the idea. The argument as to copies furnished the individual abrasive manufacturers is given support by the custom of the trade developed in Work's testimony, to hold such developmental work for customers confidential. The argument as to the Patent Office copy is dubious, for it was available to anyone sufficiently interested to go through the patent file. It is academic, in any case, in view of the actual sale at the Chicago show in September 1947 of chucks and segments, without restrictions as to their use. From that time on Norton could have obtained the dimensions of the segments without violation of confidence through the purchasers, since they had purchased the chuck and segments so far as appears for commercial use without any restriction on revealing whatever information could be obtained from them. There was

a violation of confidence on any sales of segments without Titcomb's permission prior to the Tool Show, or if the only sales at the Tool Show were to the abrasive manufacturers in confidence, then on any sales prior to the sale to General Electric in 1948. That sale was with Titcomb's approval, without any requirement by Titcomb or by custom that General Electric hold the dimensions confidential. From that time on there was nothing confidential about the segment dimensions, and Norton can be held for violation of confidence thereafter only if the original breach of confidence is a permanent bar to Norton's use of the dimensions, on the claimed theory of the Franke case, which we believe not applicable on the facts here.

We turn then to the other claims of unfair competition. Since the failure to fit is caused in part by variations in the clamp bodies from the original, we cannot say that sale of segments varying slightly from the original, but still fitting the original chuck, is in itself sale of such an inferior article under the general AA–1 or Titcomb designation as to constitute unfair competition.

The designations AA and Titcomb for the chucks and segments were not intended to indicate the source of the segment, that is, the name of its manufacturer, but rather a designation of its shape, in accordance with the custom in the industry. There is therefore no violation of trademark rights or unfair competition in the use of the designation by Norton in its catalogues.

Since there is no passing off of Norton segments as of Titcomb's manufacture, the only remaining possible basis for recovery aside from the breach of confidence is damage to the reputation of the Titcomb chuck through Norton's furnishing of segments unfit for use in the chuck. Here we run into the complication of slight changes by Norton during segment manufacture, which do not prevent a good commercial fit in the clamp bodies of a chuck purchased from Titcomb's licensee as an embodiment of the Titcomb design, but do prevent a proper

commercial fit in chuck clamp bodies of later improved design which vary from the dimensions of the earlier clamp bodies, but which still properly accommodate segments adhering to the original dimensions. There is here a danger of damage to the reputation of Titcomb's chucks, for Norton's segment salesmen are humanly likely to blame poor fit on the chuck. Yet there is no confusion as to the source of the segments, and the danger of damage would not have occurred without Titcomb's variation of the original clamp body design. In these circumstances, no actual damage having been shown, there is no basis for recovery because of Norton's sale of segments under the designation AA or Titcomb varying in dimensions from the original dimensions pirated by Norton and now publicly available through the Grinding Wheel Institute and otherwise.

Plaintiff seeks also in his briefs to raise a claim of conspiracy by defendant with members of the industry to damage plaintiff. The exact basis of an illegal agreement claimed to have been proved is not clear. No concerted action or agreement to violate plaintiff's confidence has been established. The most that is shown is consultation in the industry as to the action taken with regard to taking licenses or resisting patent claims. This in itself is not actionable.

The plaintiff has not shown a basis for relief on any count. Judgment may enter for defendant to recover its costs.

### MEMORANDUM RE ADDITIONAL FINDINGS AND CONCLUSIONS

The following additional findings of fact are made:

35(a). The evidence discloses that there are no chucks of the AA–1 design made and sold by anyone other than plaintiff and his licensees.

36(a). There is no evidence of any sales of AA–1 segments by defendant without the consent of plaintiff prior to April, 1950.

The court declines to delete the word "pirated" from the opinion.

The court declines to amplify the conclusions to pass on whether, if the wheel patent were valid, defendant should be held a contributory infringer under 35 U.S.C. § 271(b) or (c).